UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TRINITY UNIVERSAL INSURANCE COMPANY OF KANSAS, *an insurance company licensed to do business in the state of Washington* and MID CENTURY INSURANCE COMPANY, *an insurance company licensed to do business in the state of Washington*,

Plaintiffs,

v.

NORTHLAND INSURANCE COMPANY, *an insurance company licensed to do business in the state of Washington* and NORTHFIELD INSURANCE COMPANY, *an insurance company licensed to do business in the state of Washington*,

Defendants.

CASE NO. C07-0884-JCC

ORDER

This matter comes before the Court on Defendants' Motion for Summary Judgment on Point Elliot Claims (Dkt. No. 13), Plaintiffs' Response (Dkt. No. 17), and Defendants' Reply (Dkt. No. 25). The Court has carefully considered these papers, their supporting declarations and exhibits, and the balance of relevant materials in the case file, and has determined that oral argument is not necessary. For the reasons explained below, the Court hereby GRANTS Defendants' motion and rules as follows.

ORDER - 1

## I. BACKGROUND AND FACTS

Pryde Corporation. ("Pryde") was the general contractor for the construction of two condominium projects in Seattle, Point Elliot and Point Nautica. (Pls.' Am. Compl. ¶ 8 (Dkt. No. 6 at 3).) Pryde subcontracted the exterior stucco work on the condominiums to Joseph J. Jefferson & Son ("Jefferson") under a contract dated May 18, 1998. (Subcontract (Dkt. No. 14-7 at 1–7).) The Point Elliot construction was substantially completed by January 12, 1999. (Hemenway Dep. 13:6–11 (Dkt. No. 14-6 at 2)).)

After completion, Pryde received complaints from the Point Elliott Condominium Owners Association about water leaks around the windows. (Mot. 4 (Dkt. No. 13).) In a letter dated February 3, 1999, Pryde wrote to Jefferson about the problems with water intrusion: "As we have discussed several times we still have a lot of water penetrations on this project. Because your response has been unsatisfactory, we have no choice but to bring in another party to remedy the problem." (Feb. 3, 1999 Letter (Dkt. No. 14-8 at 1).) In deposition testimony from the underlying case, Jefferson's field supervisor for the Point Elliot project, William Hemenway, indicated that he had "no reason to doubt" that he received the February 3 letter. (Hemenway Dep. 20:3–25 (Dkt. No. 14-6 at 9); Res. 10 (Dkt. No. 17).) Jefferson now contends that it never received this letter. (Resp. 9–11 (Dkt. No. 17).) To explain the inconsistency, Hemenway states, "I intended to say the opposite. I do not believe that I or anyone else at Jefferson received a copy of this first letter. This statement escaped my attention at the time I was reviewing the transcript." (Hemenway Decl. ¶ 22 (Dkt. No. 20 at 4).)

Subsequently, Pryde met with Jefferson and Security Sealants, another subcontractor, in an attempt to resolve the water penetration issue. (Bender Dep. 42:23–43:3 (Dkt. No. 14-10 at 8).) Security Sealants apparently conducted a physical inspection of the building and found some cracks in the stucco, which they filled with sealant. (*Id.* at 45:5–22.) Pryde also hired a third party, Tatley-Grund, to conduct a series of tests on the building to determine the exact cause of the water intrusion. (*Id.* at 43:4–6.) Tatley-Grund's test results were ultimately inconclusive and did not identify the specific problem. (Tatley-Grund

ORDER - 2

Test of 4/6/99 (Dkt. No. 19 at 15).) It reported to Pryde that the water intrusion problem was likely inherent with all stucco applications. (Bender Dep. 43:15–44:8 (Dkt. No. 14-10 at 8).)

On January 25, 2000, Pryde wrote another letter to Jefferson indicating that there were continued problems with water intrusion into the Point Elliot building. (Jan. 25, 2000 Letter (Dkt. No. 14-8 at 2).) Pryde wrote that it recognized that Jefferson had "spent some time investigating the problem," but that Pryde was "still having water penetration issues." (*Id.*) Jefferson admits that it received this second letter. (Resp. 12 (Dkt. No 17).) Following receipt of this letter, Jefferson conducted tests on the building and concluded that the water intrusion was most likely caused by the windows—not the stucco that it had installed. (Jefferson Test (Dkt. No. 14-8 at 3); Hemenway Decl. ¶ 29 (Dkt. No. 20 at 4).)

Despite repeated demands for payment by Jefferson, Pryde refused to pay it the balance owed on the subcontract for the Point Elliot stucco work. (Mehrer Dep. 51:18–52:12 (Dkt. No. 14-9 at 5–6).) Consequently, Jefferson sued Pryde on July 19, 2000, to collect the unpaid amount of the subcontract. (Jefferson Compl. (Dkt. No. 18 at 5–9).) In its Answer on September 7, 2000, Pryde claimed as an affirmative defense that Jefferson's construction was defective.[1] (Pryde Ans. 3 (Dkt. No. 18 at 13).) Approximately eight months later, on May 11, 2001, Jefferson purchased an insurance policy with Defendant Northfield Insurance Co. ("Northfield"). (Ins. Policy (Dkt. No. 14-2 at 1–8).)

On April 13, 2001, the Point Elliot Condominium Owners Association brought suit for defective construction against Pryde (Point Elliot Compl. (Dkt. No. 14-8 at 4–7)), which later asserted a third-party claim against Jefferson. (Mehrer Dep. 56:23–57:5 (Dkt. No. 14-9 at 9–10).) Jefferson, in turn, tendered the claim to Plaintiffs Trinity Universal Insurance Company of Kansas and Mid-Century Insurance Company, its insurers from 1998 to 2001. (Pls.' Am. Compl. ¶¶ 15–16 (Dkt. No. 6 at 3).) Plaintiffs thereby provided coverage and a defense to Jefferson in the litigation. (*Id.* at ¶ 25.) Later, on April 9, 2004, Plaintiff insurers gave notice of the claim to Defendant Northfield. (Northfield Tender

---

[1] Jefferson's suit against Pryde was eventually resolved. (*See* Stip. Letter (Dkt. No. 18 at 15).)

ORDER - 3

Letter (Dkt. No. 15 at 5).) After an investigation, Northfield responded on April 27, 2004, that its coverage did not apply because, *inter alia*, Jefferson knew of the claimed damage prior to the inception of Northfield coverage. (Denial Letter (Dkt. 15 at 7–11).) Plaintiffs subsequently settled the claim on Jefferson's behalf. (Mot. 7 (Dkt. No. 13); Resp. 5 (Dkt. No. 17).)

On May 8, 2007, Plaintiffs brought the instant action in King County Superior Court for breach of contract, contribution, declaratory judgment, bad faith, and violation of Washington's insurance regulations. (Compl. (Dkt. No. 1 at 7–13).) Plaintiffs later removed the case to this Court. (Removal (Dkt. No. 1 at 1–4).) Plaintiffs seek contribution for the Point Elliot-related defense costs and settlement, and the Point Nautica-related defense costs.[2] (Pls.' Am. Compl. ¶¶ 29–52 (Dkt. No. 6 at 4–6).) In addition, Plaintiffs seek damages alleging their claim was denied in bad faith and in violation of insurance regulations. (*Id.*)

Defendants seek summary judgment on the Point Elliot claims, and argue that Northfield's policy did not apply because Jefferson knew of the damage giving rise to the claim prior to the policy's inception. (Mot. 2 (Dkt. No. 13).) Defendants request that the Court (1) dismiss all claims against Northland, (2) dismiss all Point Elliot-related claims against Northfield, and (3) dismiss Plaintiffs' causes of action for bad faith and violation of Washington's insurance regulations. (*Id.* at 14.) The Court will address each in turn below.

## II. ANALYSIS

### A. Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of fact

---

[2]Defendant Northfield apparently provided contribution for its portion of the indemnity costs in the Point Nautica matter. (Burdick Decl. ¶ 8 (Dkt. No. 21 at 2); Pls.' Am. Compl. ¶ 49 (Dkt. No. 6 at 6).)

ORDER - 4

exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is in fact a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

### B. Claims Against Northland Insurance Company

Northfield requests that the Court dismiss all claims against Northland Insurance Company. (Mot. 8 (Dkt. No. 13).) Northfield argues that "Northland Insurance Company" is not a proper defendant because it did not issue any insurance policy at issue in the case. (*Id.*) In support of its motion, Northfield submits Jefferson's insurance policy, the Declaration of Lee Laursen, and other claim correspondence. Plaintiffs' Response does not directly address this issue. The only evidence submitted by Plaintiffs is William Werner's Declaration that "Northland Insurance Company is clearly a business entity" and its name is prevalent in discovery documents. (Werner Decl. ¶ 4 (Dkt. No. 19-2 at 2).)

The evidence before the Court demonstrates that "Northfield Insurance Company" was the relevant insuring entity.[3] Jefferson's insurance policy clearly delineates that"Northfield Insurance

---

[3]Northfield is a member of a group of three insurance companies (Northland Insurance Company, Northland Casualty Company, and Northfield Insurance Company) commonly referred to collectively as "Northland Insurance Companies," which appears as the header on the insurance policy and other

ORDER - 5

Company" provided the coverage—not "Northland Insurance Company." (Ins. Policy (Dkt. No. 14-2 at 1, 5).) In response to Plaintiffs' tender, Northfield's representative specifically indicated throughout the letter that he was acting on behalf of "Northfield Insurance Company." (Tender Resp. Letter (Dkt. No. 15 at 5).) Plaintiffs have failed to offer sufficient evidence to establish a genuine issue as to whether they have a claim against Northland Insurance Company. Accordingly, the Court finds that summary judgment on this issue is warranted, and hereby DISMISSES Plaintiffs' claims against Northland Insurance Company.[4]

## C. Point Elliot-Related Contractual Claims Against Northfield Insurance Company

The outcome of Plaintiffs' claims for breach of contract and contribution depends on whether Jefferson's Point Elliot claim was excluded from coverage by the terms of the insurance policy. Defendant argues that because Jefferson knew of the building's water damage prior to the insurance policy's inception, the explicit language of the policy excluded the Point Elliot claim from coverage. (Mot. 9–10 (Dkt. No. 13).) Plaintiffs agree that the policy permitted Defendant to deny coverage "where the insured has knowledge of a loss prior to the inception of coverage." (Resp. 15 (Dkt. No. 17).) However, Plaintiffs respond and assert that Jefferson was not on "actual subjective notice of the 'leak' issue," and therefore the Point Elliot claim did not constitute a known loss. (*Id.* at 9.)

### 1. The Northfield Insuring Agreement Precludes Coverage for Known Damage

Interpretation of an insurance policy is a question of law. *Overton v. Consolidated Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002). Courts interpreting insurance policies should be bound by the definitions provided therein. *Id.* at 327. Jefferson's policy contained an amendment of the insuring agreement, which limited coverage:

AMENDMENT OF INSURING AGREEMENT - KNOWN INJURY OR DAMAGE

---

correspondence in this case. (Mot. 8 (Dkt. No. 13); Ins. Policy (Dkt. No. 14-2 at 1, 5).)

[4]The Court will hereinafter refer to Northfield as "Defendant."

ORDER - 6

      b. This insurance applies to "bodily injury" and "property damage" only if:

. . . .

          (3) Prior to the policy period, no insured listed under Paragraph 1. of Section 11-Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

(Ins. Policy Amend. (Dkt. No. 14-3 at 28).) The policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it[.]" (Ins. Policy (Dkt. No. 14-2 at 13).) Thus, the insurance policy explicitly excludes from coverage any physical injury to tangible property known by the insured to have occurred "in whole or in part" prior to the policy period.

### 2. Jefferson Knew of the Property Damage Prior to the Policy Period

Defendant argues that Jefferson had notice of the water damage allegedly caused by its work before the inception of the insurance policy on May 11, 2001. (Mot. 9 (Dkt. No. 13).) Plaintiffs assert that because "Jefferson personnel never believed that their work contributed to the problems that were being experienced at Point Elliot," it never received "real notice" that it would be responsible for the damage associated with the water intrusion. (Resp. 13–14 (Dkt. No. 17).) As discussed below, Plaintiffs' argument misses the mark. The issue is not whether Jefferson had notice that it was *liable* for the water damage, but rather whether it had notice of the water *damage* itself prior to policy inception. *See Overton*, 38 P.3d at 326–27.

In *Overton v. Consolidated Insurance Co.*, 38 P.3d 322, 325 (2002), the Washington Supreme Court specifically addressed a question remarkably similar to the case at bar: What type of prior knowledge is required to preclude coverage under the known-loss principle? There, Spokane Transformer Company sued its insurers for breach of contract, bad faith, and violation of the Consumer Protection Act after they rejected its tender of a clean-up contribution claim. *Id.* at 323. In affirming

ORDER - 7

summary judgment dismissal on all claims, *id.* at 330, the court found that because Spokane Transformer knew of the contamination before purchasing the policies, "coverage was properly denied under the known-loss principle." *Id.* at 329. The court explained that "the proper inquiry is whether Spokane Transformer expected the physical injury to tangible property without regard to ownership of that property." *Id.* Thus, "regardless of when Spokane Transformer became *liable* . . . for contribution to the cleanup costs, the *property damage* was not unexpected from Spokane Transformer's standpoint." *Id.* at 328 (emphasis added). The relevant inquiry is simply whether the insured knew of the underlying property damage prior to the policy period regardless of when it became liable for such damage.

The evidence before the Court demonstrates that Jefferson had knowledge of the property damage underlying the Point Elliot claims prior to the inception of the policy. Regardless of whether Jefferson actually received the February 3, 1999 letter, which it disputes, the record provides ample evidence that Jefferson had notice of the water damage allegedly caused (at least in part) by its stucco work. The following uncontroverted facts establish that Jefferson had sufficient knowledge of water intrusion problems before May 11, 2001, to exclude coverage on the Point Elliot claim as a known-loss.

First, Jefferson's field supervisor on the Point Elliot project admits that he had discussions with Pryde concerning the water intrusion problem prior to the disputed February 3, 1999 letter. (Hemenway Dep. 26:1–27:6 (Dkt. No. 14-6 at 10–11).) Second, Jefferson does not dispute that it received the January 25, 2000 letter (Resp. 12 (Dkt. No 17)), in which Pryde informed Jefferson that it was "still having water penetration issues." (Jan. 25, 2000 Letter (Dkt. No. 14-8 at 2).) Third, following receipt of the January 25, 2000 letter, Jefferson conducted tests on the building, thereby indicating it was aware of a serious water problem. Jefferson's conclusion that its stucco work did not cause water damage is immaterial to the question of whether Jefferson had notice of the property damage that gave rise to the claimed loss. *See Overton*, 38 P.3d at 326 ("The dispositive issue is not *how* the insured was notified of property damage, but *whether* the insured had such notice prior to purchasing the policy.") Finally, on September 7, 2000, Pryde answered Jefferson's complaint by stating that Jefferson's construction was

ORDER - 8

defective (Pryde Ans. 3 (Dkt. No. 18 at 13)), and as a result, Jefferson's president admitted he was aware "that Pryde was claiming that Jefferson's work was defective and resulted in water damage." (Mehrer Dep. 54:4–25 (Dkt. No. 14-9 at 8).)

Plaintiffs' Response does not controvert or provide any evidence controverting the above facts. Instead, Plaintiffs essentially argue that because there was no conclusive determination of Jefferson's liability for the water damage prior to the policy's inception, Jefferson's notice was insufficient to constitute a known-loss. (*See* Resp. 9 (Dkt. No. 17).) Plaintiffs' position is simply contrary to the controlling standard set forth in *Overton*, which provides that "the insured merely must be on notice" of the *property damage* (that resulted in liability) prior to purchasing the policy. 38 P.3d at 326–7.

Under the explicit terms of the insuring agreement, an insured's knowledge of property damage prior to the policy period constitutes a known-loss excluded from coverage. (Ins. Policy Amend. (Dkt. No. 14-3 at 28).) Because it is undisputed that Jefferson had notice of the water intrusion and damage at the Point Elliot project prior to the policy period, Defendant properly denied coverage. Accordingly, the Court hereby DISMISSES Plaintiffs' Point Elliot claims for breach of contract and contribution.

**D. Bad Faith Claim**

Defendant argues that Plaintiffs, as insurers, lack standing to bring a bad faith claim faith because they have not established that they are assignees of Jefferson (the insured). (Mot. 14 (Dkt. No. 13).) Plaintiffs' response fails to controvert this assertion.[5] Generally, an action for breach of good faith against an insurer is limited to the insured, and a third party claimant has no right of action against an insurance company for bad faith. *Tank v. State Farm Fire & Cas. Co.*, 715 P.2d 1133, 1140 (Wash. 1986). An insured, however, may assign their rights to a bad faith claim to a third party. *Safeco Ins. Co. of Am. v. Butler*, 823 P.2d 499, 508 (Wash. 1992). Here, Plaintiffs have failed to offer any affirmative evidence

---

[5]Plaintiffs' only mention of their assignee status is provided in their Amended Complaint, which alleges: "Northland's failures constitute bad faith with respect to Plaintiffs' assignor Jefferson." (Pls.' Amend. Compl. ¶ 39 (Dkt. No. 6 at 5).)

ORDER - 9

demonstrating that Jefferson assigned it rights to a bad faith claim. Consequently, Plaintiffs lack standing to assert a bad faith claim in this action.

Even if Plaintiffs could establish standing, they nevertheless have failed to establish that Defendant's conduct constituted bad faith. To establish a bad faith claim, a plaintiff must show that the insurer's breach of the insurance contract and was "unreasonable, frivolous, or unfounded." *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d 1124, 1126 (Wash. 1998). "Claims of bad faith are not easy to establish and an insured has a heavy burden to meet." *Overton*, 38 P.2d at 329. If the insurer's denial of coverage or failure to defend was based on a "reasonable interpretation of the insurance policy," then there is no action for bad faith. *Kirk*, 951 P.2d at 1126. As discussed above, Defendant's denial of coverage was based on a reasonable interpretation of the insuring agreement, which specifically excluded coverage for known property damage. After an investigation, Defendant promptly denied coverage based on the language of the insuring agreement and facts admitted by the insured's owner and superintendent. (Laursen Decl. ¶¶ 3–5 (Dkt. No. 15 at 2).) Plaintiffs have not presented evidence showing that Defendant's conduct was unreasonable, unfounded or frivolous. Therefore, no issue of material fact exists and the Court hereby DISMISSES Plaintiffs' bad faith claim.

### E.  Insurance Regulations Claim

Plaintiffs also allege that Defendant engaged in unfair claims settlement practices in violation of insurance regulations set forth in Washington Administrative Code 284-30-300 *et seq.* (Pls.' Am. Compl. ¶¶ 40–44 (Dkt. No. 6 at 5).) In *Tank v. State Farm Fire & Casualty Co.*, 715 P.2d 1133, 1140 (1986), the Washington Supreme Court held that the insurance regulations do not create a cause of action against insurers for third party claimants. Nothing in the language of the regulations gives third party claimants the right to enforce the rules, or otherwise indicates an intent by the insurance commissioner to create such a right. *Id.* Thus, the enforcement of these rules on behalf of third parties should be the province of the insurance commissioner, not individual third party claimants. *Tank*, 715 P.2d at 1140.

ORDER - 10

Washington law does not allow a direct cause of action for violation of the insurance regulations. *Tank* clearly controls and it mandates dismissal of Plaintiffs' claim for regulatory violations. *See Dussault v. Am. Int'l Group, Inc.*, 99 P.3d 1256, 1259 (Wash. Ct. App. 2004). The Court therefore DISMISSES Plaintiffs' claim for violation of the insurance regulations.[6]

## III. CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Defendants' motion for summary judgment on the Point Elliot claims (Dkt. No. 13).

SO ORDERED this 23rd day of September, 2008.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

---

[6] The Court declines to rule on Plaintiffs' contribution claim on the Point Nautica claim because the parties did not brief this issue and Defendants' motion for summary judgment was limited to Point Elliot claims.

ORDER - 11